Judgment rendered November 18, 2020.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 53,443-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                                  Appellee

versus

DAVID WAYNE SHARP                                   Appellant

* * * * *

Appealed from the
Third Judicial District Court for the
Parish of Union, Louisiana
Trial Court No. 2016F53641

Honorable Thomas W. Rogers, Judge

* * * * *

LOUISIANA APPELLATE PROJECT          Counsel for Appellant
By: Meghan Harwell Bitoun

JOHN FITZGERALD BELTON               Counsel for Appellee
District Attorney

CLIFFORD ROYCE STRIDER, III
E. MICHAEL MAHAFFEY
Assistant District Attorneys

* * * * *

Before PITMAN, COX, and BLEICH *(Pro Tempore)*, JJ.

BLEICH, J. *(Pro Tempore)*, concurring in part and dissenting in part with
written reasons.

**COX, J.**

This appeal arises from the Third Judicial District Court, Union Parish, Louisiana. The defendant, David Wayne Sharp, appeals his verdict because it was rendered by a six-person jury, rather than a twelve-person jury, which he contends is in violation of his federal Sixth and Fourteenth Amendment rights. Mr. Sharp also appeals his designation as a fourth-felony offender under the 2016 revision of La. R.S. 15:29.1. For the following reasons, we affirm his conviction and vacate his sentence.

## FACTS

On August 16, 2016, Mr. Sharp was charged by bill of information with domestic abuse battery, third offense, of the victim, Tara Hunt ("Ms. Hunt"), in violation of La. R.S. 14:35.3(A) and (E). The offense occurred on either June 24, 2016 or June 30, 2016.[1] Mr. Sharp previously pled guilty to two prior domestic abuse battery charges.

On May 20-21, 2019, a six-person jury trial was held. Ms. Hunt testified that she and Mr. Sharp previously had a romantic relationship, but there were times when the pair would break up, which resulted in Mr. Sharp leaving their shared home for extended periods of time. Ms. Hunt testified that a few days before June 30, 2016, she and Mr. Sharp had an argument and he left their home. When Mr. Sharp returned, they had another argument, however, this time, Ms. Hunt attempted to leave. Ms. Hunt testified that as she approached her car to leave, she realized she left her phone, so she returned to the home to retrieve it. When she stepped onto the

---

[1] As indicated in the bill of information, the offense occurred on June 24, 2016. However, at trial, witnesses testified that the date of the offense was June 30, 2016. Because there is no amended bill of information in the record, and police reports list the dates of the offense as being both June 24 and June 30, 2016, it is uncertain when the incident was reported.

porch, Mr. Sharp threw her down with considerable force, grabbed her by her hair, clothing, feet, and ankles, and dragged her inside the house. Once inside and the door closed, Mr. Sharp proceeded to strike Ms. Hunt with a closed fist on her back, sides, and head before he threw her onto the couch. Mr. Sharp was found guilty as charged by a unanimous six-person jury of domestic abuse battery, third offense.

On May 23, 2019, the State filed a habitual offender bill charging Mr. Sharp as a fourth felony offender based upon the following predicate offenses:

1. On June 15, 2011, Mr. Sharp pled guilty to unauthorized entry of an inhabited dwelling in violation of La. R.S. 14:62.3. Mr. Sharp was sentenced to three years at hard labor and three years of supervised probation.

2. On September 7, 2011, Mr. Sharp pled guilty to unauthorized entry of an inhabited dwelling in violation of La. R.S. 14:62.3. Mr. Sharp was sentenced to serve four years at hard labor.

3. On September 18, 2013, Mr. Sharp pled guilty to violation of a protective order, third offense with battery, in violation of La. R.S. 14:79(B)(3). Mr. Sharp was sentenced to serve one year at hard labor, of which six months was to be served consecutively with any parole revocation time.

On June 6, 2019, Mr. Sharp filed motions for a post-verdict judgment of acquittal and a new trial, both of which were denied on June 19, 2019. On August 21, 2019, a habitual offender hearing was held and Mr. Sharp stipulated that he was convicted of the offenses listed in the habitual offender bill. However, during the hearing, Mr. Sharp questioned whether all of his predicate offenses fell within the appropriate cleansing period under Louisiana's Habitual Offender Law. On September 11, 2019, the trial court found that the 2016 version of the Habitual Offender Law applied and the appropriate cleansing period under this version of the law was ten years.

The trial court found that Mr. Sharp was correctly adjudicated as a fourth-felony offender because the predicate offenses provided in the habitual offender bill fell within the ten-year cleansing period. Mr. Sharp was sentenced to 25 years at hard labor, with credit for time served, but without the benefit of parole or suspension of sentence under La. R.S. 15:529.1(G). Mr. Sharp now appeals his conviction and sentence.

**DISCUSSION**

*Jury Composition*

Mr. Sharp contends that the trial court deprived him of his constitutional right to due process under the federal Sixth and Fourteenth Amendments because his conviction and subsequent sentence was produced from an unconstitutionally implemented six-person jury, rather than the required twelve-person jury. Mr. Sharp concedes that the United States Supreme Court, notably in *Williams v. Florida*, 399 U.S. 78, 103, 90 S. Ct. 1893, 1907, 26 L. Ed. 2d 446 (1970), established a long-established precedent which declared that a defendant's "Sixth Amendment rights, as applied to the states through the Fourteenth Amendment, [is] not violated by [the State's] decision to provide a [six-man] rather than a [twelve-man] jury." *Id*. Mr. Sharp further acknowledges that the Louisiana Supreme Court concurred with the Supreme Court's holding in *Williams*, as provided in *State v. Jackson*, 247 So. 2d 558 (1971).

Nevertheless, Mr. Sharp questions the constitutional viability of convictions rendered by a jury of less than twelve jurors, and argues that, "twelve-person juries are more likely to consist of a fair cross-section of society, give pause to minority views, deliberate longer, and reach more consistent verdicts than six-person juries." Specifically, Mr. Sharp contests

3

that the *Williams* Court determination that six-person juries were the functional equivalent of twelve-person juries was purely the result of functionality, not historical context. Such a decision, he argues, has been largely undermined by the Court's jurisprudence throughout the last twenty years, and there is no longer a clear answer to whether a jury of six is constitutional.

Mr. Sharp first cites the Court's decision in *Apprendi v. New Jersey*, 530 U.S. 480, 466 (2000), in which the Court discarded the functional approach in favor of restoring the jury trial "practice" as it existed "at common law" with respect to resolving questions of constitutional criminal procedure. *Id. See also*, *Crawford v. Washington*, 541 U.S. 36 (2004) (the Court overturned prior case law and held that the Sixth Amendment right to confront witnesses required the exclusion of testimonial hearsay, regardless of the reliability of that evidence.); *Blakely v. Washington*, 542 U.S. 296 (2004); *Ring v. Arizona*, 536 U.S. 584 (2002); and *Jones v. United States*, 526 U.S. 227, 246 (1999) (the Court warned of "secret machinations, which may sap and undermine the right to [a] jury trial").

Mr. Sharp further provides in *Ballew v. Georgia*, 435 U.S. 223 (1978), that when the Court concluded that five-person juries failed to satisfy the Constitution, it cast doubt on the viability of its holding in *Williams* and the strength of the evidence used to uphold six-person juries as the functional equivalent of twelve-person juries. As a result of nearly forty years of empirical research, seemingly contradictory case law, and the Framers intent for criminal petit juries to consist of twelve jurors, Mr. Sharp asserts that the decisions in *Williams* and *Jackson* are no longer good law, because there is "no discernible evidence" to demonstrate that twelve-person juries

4

outperform six-person juries. Thus, his conviction and sentence should be reversed.

In contrast, the State argues that pursuant to La. C. Cr. P. art. 782, "[a] case in which the punishment may be confinement at hard labor shall be tried by a jury composed of six jurors, all of whom must concur to render a verdict." *See*, *State v. Dahlem*, 2014-1555 (La. 3/15/16), 197 So. 3d 676. Given that the punishment for which Mr. Sharp was convicted, domestic abuse, third offense, provides for a term which may be imposed with or without hard labor, the State avers that the six-person jury trial was within full compliance of Article 782. With respect to Mr. Sharp's argument that the failure to have a twelve-person jury in light of his twenty-five-year sentence under a Habitual Offender Bill taints his due process rights, the State deferred to the Louisiana Supreme Court's holding in *State v. Dahlem*, 2014-1555 (La. 3/15/16), 197 So. 3d 676.

In *Dahlem*, the Court discussed a Habitual Offender sentence in which a six-person jury was employed and held:

> "Given that the enhanced sentence to which the evidence made [the] defendant subject was not apparent on the face of the bill of information, we specifically decline to create a duty requiring a trial judge to look beyond the face of the bill of information or the indictment, and the Title penalty range. Nor is it the responsibility of a trial judge to interrogate the district attorney or independently investigate as to what evidence might be introduced that would require a different jury composition at the outset of the case. Doing so would be inappropriate and contrary to the efficient administration of criminal justice, and effectively result in bad policy."

The Louisiana Constitution art. I § 17 (A) provides, in pertinent part, as follows:

> A case in which punishment may be capital shall be tried by a jury of twelve jurors, all of whom must concur to render a verdict. A case for an offense committed prior to January 1,

5

2019, in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict. A case for an offense committed on or after January 1, 2019, in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, all of whom must concur to render a verdict. A case in which the punishment may be confinement at hard labor shall be tried by a jury composed of six jurors, all of whom must concur to render a verdict.

La. C. Cr. P. art. 782 provides that cases in which the punishment may be confinement at hard labor shall be tried by a jury composed of six jurors, all of whom must concur to render a verdict. La. R.S. 14:35.3 (A) and (E) provide that a conviction for a third offense of domestic abuse battery carries a term of imprisonment with or without hard labor. As the law currently stands, a fact to which Mr. Sharp concedes from the holding in *Williams*, a trial before a six-person jury for charges that do not automatically carry with it a punishment of confinement at hard labor remains constitutional. Therefore, Mr. Sharp's claim does not warrant relief. We affirm Mr. Sharp's conviction.

*Habitual Offender Statute*

In his second assignment of error, Mr. Sharp argues that the trial court misapplied the ten-year cleansing period of the habitual offender law in adjudicating him as a fourth-felony offender. He argues the trial court should have applied the five-year cleansing period to his predicate offenses. Mr. Sharp contends that the habitual offender law provides that the five-year cleansing period shall be used for defendants whose convictions were not final prior to November 1, 2017. He argues that his conviction did not become final until 2019, thus, the five-year cleansing period applies. Mr. Sharp further attests that the trial court incorrectly applied the 2016 version of the Habitual Offender Statute, La. R.S. 15.529.1, simply because the

6

offense in this case was committed on June 24, 2016. This application, he asserts, is legal error because the 2016 version of the statue required a ten-year cleansing period, while the 2017 version of the statute requires a five-year cleansing period.

Mr. Sharp maintains that the trial court relied upon old law in applying the ten-year cleansing period by citing a judgment that was rendered several months prior to the effective date of Act 282, which provided that the applicable cleansing period "is one in effect at the time the defendant committed the following offense." *State v. Casaday*, 51,947 (La. App. 2nd Cir. 2018), 247 So.3d 1057. He argues that the trial court erroneously concluded that "[a]ll [of Mr. Sharp's] felonies occurred within the [ten] year cleansing period set forth in La. 15:529.1(C) in effect on the date of the offense, June 24, 2016." The State argues that the evidence presented at Mr. Sharp's habitual offender hearing provides that he is considered a fourth-felony offender under either the ten-year or five-year cleansing period. The State provided that on June 15, 2011, Mr. Sharp was sentenced to imprisonment for three years for his oldest predicate offense, and that the offense in question occurred on June 24, 2016 or June 30, 2016. Therefore, the State contends in their brief, that not more than five years elapsed between the expiration of the correctional supervision for Mr. Sharp's oldest predicate offense and the commission of the current offense.

The State further argued that the trial did not commit legal error in finding that Mr. Sharp is a fourth-felony offender because the 2016 version of the Habitual Offender Statute, La. R.S. 15:529.1, invokes a ten-year cleansing period. The State notes that Mr. Sharp did not contest the sufficiency or admissibility of the evidence produced at his habitual offender

7

hearing, nor did he provide any evidence that his status as a fourth-felony offender would change if the trial court implemented the five-year cleansing period. **The State, through Mr. Strider at the Multiple Offender Hearing, notes that Mr. Sharp's prior convictions were each within five years of the date of the offense in question, except one conviction which occurred, "within a couple [of] months of five years."** (Emphasis added).

On June 15, 2011, Mr. Sharp pled guilty to unauthorized entry of an inhabited dwelling and was sentenced to imprisonment for three years and three years of probation. On September 7, 2011, Mr. Sharp pled guilty to unauthorized entry of an inhabited dwelling and was sentenced to four years at hard labor. On September 18, 2013, he pled guilty to a violation of a protective order-third offense with battery and was sentenced to one year of hard labor without probation. Based on this information, the State then argues that because Mr. Sharp was sentenced on June 15, 2011 for his oldest predicate offense, and that the offense in the present case occurred on June 24, 2016 or June 30, 2016, five years had yet to elapse between the date of the current offense and the expiration of his imprisonment as alleged in the multiple offender bill under LA. R.S. 15:529.1(C)(1). The State argues that the trial court's reliance upon the ten-year cleansing period was mere harmless error because the outcome would have been the same.

The Louisiana Supreme Court in *State v. Lyles*, 2019-00203 (La. 10/22/19) 286 So. 3d 407, addressed the effective date of the 2017 amendments to Louisiana's Habitual Offender Law as well as Subsection K, added by Act 542 of 2018. In *Lyles*, the defendant committed aggravated battery on February 1, 2015. Because the defendant had two prior predicate offenses, a 1991 distribution conviction and a 2004 manslaughter conviction,

8

the State filed a third-felony habitual offender bill of information on November 16, 2016. The defendant was later adjudicated as a third-felony offender on February 13, 2017 and given a sentence of life imprisonment in accordance with the 2015 habitual offender provisions. On appeal, the defendant relied on Section 2 of Act 282, which provided that "[t]his Act shall become effective November 1, 2017, and shall have prospective application only to offenders whose convictions became final on or after November 1, 2017." The defendant argued that the 2017 amendments should have been applied because he was subject to a five-year cleansing period.

In addressing the defendant's position, the Court considered whether the defendant's habitual offender status and sentence were governed by either: (1) La. R.S. 15:529.1 as it existed at the time the offense was committed on February 1, 2015, (2) the 2017 amended La. Acts 282, or (3) the 2018 amended La. Acts 542. The Court first noted that, "the relevant portion of Act 282 provides: "This Act shall become effective November 1, 2017, and shall have prospective application only to offenders whose convictions became final on or after November 1, 2017." 2017 La. Acts 282, § 2. Act 542 added new Subsection (K) to R.S. 15:529.1:

> K. (1) Except as provided in Paragraph (2) of this Subsection, notwithstanding any provision of law to the contrary, the court shall apply the provisions of this Section that were in effect on the date that the defendant's instant offense was committed.
>
> (2) The provisions of Subsection C of this Section as amended by Act Nos. 257 and 282 of the 2017 Regular Session of the Legislature, which provides for the amount of time that must elapse between the current and prior offense for the provisions of this Section to apply, shall apply to any bill of information filed pursuant to the provisions of this Section on or after November 1, 2017, accusing the person of a previous conviction.

9

2018 La. Acts 542, § 1 (effective August 1, 2018).

The *Lyles* Court then concluded that, "from the plain language of these provisions in conjunction with the effective dates of the acts, the legislature appears to have created three categories of persons potentially affected by these provisions:

1. There are persons—like the present defendant—whose convictions became final on or after November 1, 2017, and whose habitual offender bills were filed before that date. Those defendants would be eligible to receive the benefits of all ameliorative changes made by Act 282.

2. There are persons whose convictions became final on or after November 1, 2017, and whose habitual offender bills were filed between that date and August 1, 2018 (the effective date of Act 542). Those persons would be eligible to receive the benefit of the reduced cleansing period, and they may also colorable claims to the other ameliorative changes provided in Act 282, although we need not decide that question today.

3. Finally, there are persons whose convictions became final on or after November 1, 2017, and whose habitual offender bills were filed on or after August 1, 2018. They would receive the reduced cleansing period by operation of Subsection K(2) added by Act 542 but their sentences would be calculated with references to the penalties in effect of the date of commission in accordance with Subsection K(2) added by Act 542.

*Lyles*, *supra*.

The *Lyles* Court held that, "for persons like [Lyles], whose convictions became final on or after November 1, 2017, and whose habitual offender bills were filed prior to that date, the full provisions of Act 282 apply."

In the present case, Mr. Sharp committed the offense in question in 2016, however, his conviction occurred in 2019, and his habitual offender bill was not filed until 2019. Under the facts provided in *Lyles*, Mr. Sharp falls within category three. Specifically, Mr. Sharp's habitual offender

10

adjudication and sentencing occurred before the opinion in *Lyles* was rendered and the trial court applied the ten-year cleansing period as provided in the 2016 version of the habitual offender law. Accordingly, the trial court must now contemplate whether Subsection K(2) added by Act 542 will have any effect upon the applicable cleansing period. Furthermore, the trial court, according to the transcript, failed to properly advise Mr. Sharp of the prescriptive periods within which he must apply for post-conviction relief. As such, we are required to vacate Mr. Sharp's sentence and remand the case to the trial court for resentencing in consideration of *Lyles, supra* and so Mr. Sharp can be advised of his post-conviction rights.

## CONCLUSION

For the aforementioned reasons, Mr. Sharp's conviction is affirmed. Pursuant to the changes made under La. R.S. 15:529.1 of the Habitual Offender law, his sentence must be vacated and the case remanded back to the trial court to be resentenced according to the changes made by the legislature and interpreted by the Louisiana Supreme Court in *Lyles* and so that Mr. Sharp can be advised of his post-conviction rights.

**CONVICTION AFFIRMED; SENTENCE VACATED AND CASE REMANDED FOR RESENTENCING.**

11

**BLEICH, J. (*Pro Tempore*), concurring in part and dissenting in part.**

This writer concurs with the majority opinion as to the "12-person" jury trial issue.

Counsel for the defendant never raised that issue or made that request prior to jury selection, thus making such a request at the appellate level inappropriate as having been waived. There is no statutory or jurisprudential authority for a 12-person jury in a relative felony, either at the trial on the merits or in a habitual offender proceeding. To create such a rule would invade the province of the legislature and wreak havoc in the criminal justice system.[1]

In this appeal, the defendant might be attempting to create new law, but this Court cannot legislate. The well-written majority opinion is clearly correct as to this issue.

This writer respectfully dissents concerning remanding the case to the trial court.

This writer agrees with the State's argument in its brief regarding the applicable cleansing period. It appears that the dates of the defendant's release from actual custody or supervision by the State on the predicate offenses for the habitual offender bill were well within five years of the date of the commission of the instant offense. Regardless of the applicable "cleansing period," ten years or five years, we have before us the proverbial phenomenon of a "distinction without a difference," as under either

---

[1] One can easily envision certain anomalies. One example could be the requirement of a 12-person jury being empaneled on many relative felony cases, even when a habitual offender proceeding is not invoked. Another example of a bizarre result would be having to empanel two separate juries, one for the trial, the other for sentencing. Either of these would be costly and inefficient, and a disruption of the administration of justice.

1

cleansing period, the result in this case is properly the same. The sentence should be affirmed without remand.